Filed 9/14/20  In re M.J. CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re M.J., a Person Coming Under the Juvenile Court Law. | B300901 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,  Plaintiff and Respondent,  v.  J.S.,  Defendant and Appellant. | Los Angeles County Super. Ct. No. 18CCJP08128A |

APPEAL from an order of the Superior Court of Los Angeles County.  Sabina A. Helton, Judge.  Affirmed.

Suzanne Davidson, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, County Counsel, Kristine P. Miles, Assistant County Counsel, and Stephanie Jo Reagan, Deputy County Counsel, for Plaintiff and Respondent.

Father appeals a disposition order removing his eight-month-old son from his physical custody and restricting him to monitored visitation.  The juvenile court found father's marijuana abuse, recurring criminal activity, and inconsistent commitment to fatherhood posed a significant risk of physical harm to the infant.  Substantial evidence supports the findings.  We affirm.

## FACTS AND PROCEDURAL BACKGROUND

Consistent with our standard of review, we state the facts in the light most favorable to the juvenile court's findings, resolving all conflicts and drawing all reasonable inferences to uphold the court's order, if possible.  (*In re R.T.* (2017) 3 Cal.5th 622, 633 (*R.T.*).)

In December 2018, the Los Angeles Department of Children and Family Services (the Department) was alerted that M.J., a newborn infant, had a positive toxicology screen for opioids, benzodiazepine, and amphetamine.  After an investigation, the Department filed a dependency petition alleging mother had a history of substance abuse and mental and emotional problems that put the newborn at risk for serious physical harm.[1]

At two months old, M.J. was examined by a nurse practitioner.  The nurse found M.J. was "drug exposed," with "mild stiffness to bilateral lower extremities," and "significant" indications for "borderline delay in problem-solving and personal-social domain; delay in communication, gross motor, and fine motor domains."

In February 2019, a social worker interviewed father.  Father had attended two or three ultrasound appointments with mother, but mother left him in May or June of 2018 and would

---

[1]     Mother is not a party to this appeal.

not answer his calls.  He also had a nine-year-old daughter who lived with her mother in Tennessee.

Father disclosed an arrest in August 2018 for possession of seven grams of methamphetamine.  He said he sold the drug to make money, but denied using it.  He also had arrests for driving under the influence, but denied he had an alcohol problem.  His CLETS report showed an additional arrest for drug possession in October 2018.

Mother reported father was homeless, sold methamphetamine, used and sold marijuana, and had a problem with alcohol.  She said father did not want a baby and left her when he found out she was pregnant.

Father slept on a couch at a friend's apartment.  He was not currently allowed to stay in the apartment during the day, but claimed he would be if he obtained custody of M.J.  He said he looked after his daughter when she was a baby and he knew how to care for an infant.  He acknowledged telling mother to get an abortion.  He said he did so because he knew she was a heroin addict and feared the baby would suffer due to mother's addiction.  Father wanted the dependency case closed and he wanted M.J. placed in his custody immediately.

Father said he smoked marijuana every day because he needed it for pain in his leg and to sleep at night.  He had been taking "drug classes" but was discharged for missing sessions. He took a drug test on April 10, 2019.  The result was positive for marijuana.

On April 11, 2019, father had his first visit with M.J.  The foster mother reported father smelled of marijuana, and when she tried to tell him about M.J.'s eating habits, he did not pay attention.  When M.J. began to cry late in the visit, the monitor

3

suggested father prepare a bottle for him. Father declined, remarking the visit would be ending soon.

Father had another visit four days later. The foster mother reported he smelled heavily of marijuana. M.J. cried for much of the visit. When father fed M.J., he kept putting the bottle to the baby's lips, then took it away and told M.J. things like: "[Y]ou're not hungry are you"; "[I]t looks like you haven't missed a meal"; and "[Y]ou would be fine if you missed a meal." When father checked M.J.'s diaper, he remarked, "I don't want to have to change a poopy diaper, I hope you're not poopy." The foster mother reported M.J.'s diaper was wet and father did not change it.

Father's subsequent visits followed a similar pattern. He was confrontational with the foster mother, and gently scolded M.J. for looking to her for comfort when the baby cried. The Department expressed concern about the interactions, noting that father spoke to M.J. as if the infant were an adult.

After father missed and cancelled two visits in late April, the Department learned he had been arrested and jailed on a charge of making criminal threats. (See Pen. Code, § 422.) Father said the arrest stemmed from a dispute with a transit officer. He maintained he had permission to ride the bus for free and the transit officer had wrongly given him a citation for riding without a pass. Father said he felt discriminated against and confronted the officer. He claimed the officer fabricated a story about father threatening to kill him.

On May 16, 2019, a pediatric nurse practitioner saw M.J. for a cough, fever, and congestion. The nurse recommended that M.J. have no direct or indirect exposure to smoke, including marijuana smoke and residue on a smoker's clothing (third-hand

4

smoke).  Four days later the foster mother cancelled father's scheduled visit because she worried M.J. was becoming sick. Father told the foster mother he was "very upset" that "the state" was keeping M.J. from him.

Father repeatedly protested to M.J.'s social worker that the "state" was trying to make it "as difficult as possible" for him to get custody of M.J.  He was upset at being accused of smelling of marijuana at visits, and suggested he was being "discriminated against."  He acknowledged his backpack might have smelled of the drug.  When the social worker tried to talk with father about the way he engaged with M.J., father became defensive and digressed into complaints about how the " 'state' " was frustrating his efforts to bond with the infant on " 'purpose.' "

The friend with whom father stayed said father had been living in his apartment " 'off and on' " for about four to five months.  He said father's stay was temporary and father needed to find a place of his own.

On May 29, 2019, the Department filed an amended dependency petition.  In a new count the Department alleged father's substance abuse and criminal activity endangered M.J. and rendered father incapable of providing regular care to the infant.

On June 11, 2019, father notified the Department that he was considering "withdraw[ing] from the case completely and allow[ing] the state to keep [M.J]."  Father said he was "emotionally shot" and he "just want[ed] to move on with [his] life."  He was no longer participating in the prescribed drug and parenting programs, and he was unable to stay for his last visit because he had marijuana in his backpack.

On June 13, 2019, the Department asked father to submit to a drug test. Father refused. He said there was no more " 'fight' " left in him and the case had added too much " 'stress' " to his life. The next day he notified the Department that he was " 'withdrawing completely' " from M.J.'s case and that he would not be coming to any future visits.

On July 3, 2019, father contacted M.J.'s social worker about "resum[ing]" the case and scheduling new visits. He explained a family member had passed away and he wanted M.J. to know he had a big family that cared for him. But when asked to describe his plan for taking custody of his son, father could only say he was "present now." He would not agree to randomly drug test, but said he would test on demand if a social worker called him.

On August 7, 2019, a substance abuse counselor notified the Department that father had attended eight sessions in May, but only one session in June and two sessions in July. Father submitted to only one drug test, which was positive for marijuana. The counselor reported father was homeless and slept at a friend's home or on public transit. He said father did not seem to be taking the outpatient program seriously. Father was positive for marijuana on one test and failed to show for another in August.

On August 23, 2019, the juvenile court held a combined hearing on jurisdiction and disposition. Father testified he had stopped using marijuana about a month and a half ago, but said he was forced to resume using it "in lieu of pain medicine" to treat nerve damage in his leg. If he received custody of M.J., father said he would smoke marijuana before work after dropping the infant at daycare and again in the early afternoon before picking up M.J. in the evening. He acknowledged the social

worker's warning that M.J. had respiratory issues, but said he had not seen "medical proof" of the condition and emphasized that no one in his family had a history of asthma or bronchitis.

Father testified he was not living "anywhere" at present, but said he would move to a shelter that accommodated children if he received custody. He currently worked for Postmates, he also transported scooters and bikes back to their charging hubs, and he had obtained a selling permit for a mobile convenience store he planned to launch in October. He said he was prepared to care for M.J. because he was the infant's father and had cared for his daughter when she was a baby.

The juvenile court sustained the allegations against mother and father and declared M.J. a dependent child. Regarding father's marijuana use, the court explained: "The daily marijuana use, in and of itself, is not as concerning to me, but I do think there's a nexus to harm because of the young age of the baby. I would feel the same about someone taking prescription pain medication, even drinking alcohol at night, because babies do wake up at night. You might have an above-average medically-needy child here who does have some respiratory issues, which I also think is a nexus to harm." The court also found father's recent arrest and pending criminal case were cause for concern.

As for disposition, father's counsel maintained there was not "clear and convincing" evidence of the need for removal. He argued drug testing, services, and unannounced home visits would be sufficient to protect M.J. in father's custody.

The court determined the protective measures were inadequate given M.J.'s young age, and the court found by clear and convincing evidence that placing M.J. in father's custody

would pose a substantial risk of harm to the infant. The court ordered father to complete a drug program, to submit to weekly drug testing, and to participate in parenting classes and counseling. It ordered father's visits to be monitored and authorized the Department to liberalize visitation in its discretion.

Father filed a timely notice of appeal.

## DISCUSSION

### 1. *Substantial Evidence Supports the Custody Order*

In cases where a dependent child did not reside with one of his or her parents when a dependency petition was initiated, Welfare and Institutions Code section 361, subdivision (d) authorizes the juvenile court to deny that parent physical custody of the child upon a finding by "clear and convincing evidence that there would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the child for the parent . . . to live with the child or otherwise exercise the parent's . . . right to physical custody, and there are no reasonable means by which the child's physical and emotional health can be protected without removing the child from the child's parent's . . . physical custody."[2]

"The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child." (*In re T.V.* (2013) 217 Cal.App.4th 126, 135–136.) When a child is of " 'tender years,' " like M.J., parental substance abuse is prima facie evidence of substantial risk of physical harm.

---

[2] Statutory references are to the Welfare and Institutions Code.

8

(*In re Christopher R.* (2014) 225 Cal.App.4th 1210, 1220
(*Christopher R.*).) The presumption exists because " 'the absence
of adequate supervision and care poses an inherent risk to
[young children's] physical health and safety.' " (*Ibid.*)

In reviewing disposition findings under section 361,
" 'we look to see if substantial evidence, contradicted or
uncontradicted, supports them. [Citation.] In making this
determination, we draw all reasonable inferences from the
evidence to support the findings and orders of the dependency
court; we review the record in the light most favorable to the
court's determinations; and we note that issues of fact and
credibility are the province of the trial court.' " (*R.T., supra,*
3 Cal.5th at p. 633.)

Father commits most of his briefing to emphasizing positive
interactions with M.J. and a handful of drug tests that showed
diminishing marijuana levels. The record shows the juvenile
court considered that evidence, as presented in the Department's
reports and highlighted in the argument of father's counsel,
when it made the disposition order. Our role is not to determine
whether the juvenile court properly *weighed* the evidence.
We decide only whether there was substantial evidence,
" 'contradicted or uncontradicted,' " to support the court's order.[3]

---

[3] To the extent father seems to argue the evidence was not
clear and convincing because there was other evidence that
should have influenced the juvenile court's judgment, we
emphasize again that it is "not our function . . . to reweigh the
evidence or express our independent judgment on the issues
before the trial court. [Citation.] Rather, as a reviewing court,
we view the record in the light most favorable to the judgment
below and ' "decide if the evidence [*in support of the judgment*]
is reasonable, credible and of solid value—such that a reasonable

(*R.T., supra,* 3 Cal.5th at p. 633.)  There was sufficient evidence here.

The evidence showed M.J. suffered developmental delays due to his in vitro drug exposure, and he experienced respiratory complications that could be exacerbated by direct or indirect contact with smoke, including marijuana smoke residue on clothing.  However, when father was warned of the infant's condition, he downplayed the risk.  He questioned whether there was "medical proof" to substantiate it and remarked that he had no history of asthma or bronchitis in his family.  Father inconsistently tested for marijuana, he repeatedly showed up to visits smelling of smoke, and he had to leave one visit because he had marijuana in his backpack.  Father did not intend to stop smoking if the court granted him custody.  Instead, he planned to smoke in the morning after leaving M.J. at daycare and again around lunch in hopes the drug would clear out of his system before retrieving the infant in the evening.  Notwithstanding this

---

trier of fact could find [removal] is appropriate based on clear and convincing evidence." ' " (*In re Jasmon O.* (1994) 8 Cal.4th 398, 423, italics added; see also *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1001.)  Thus, in determining whether there was substantial evidence sufficient to meet the clear and convincing burden of proof, we focus on the quality of the evidence supporting the juvenile court's order—not other evidence that could have supported a different determination. (*Conservatorship of O.B.,* at pp. 995–996 ["[W]hen reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true."].)  For the reasons we discuss in this opinion, we conclude the evidence was sufficient to meet this standard.

10

evidence, father argues there was nothing to prove his marijuana use impacted his ability to properly parent M.J.  But the juvenile court was not required to wait for harm to occur.  Based on the evidence, the court reasonably inferred "there would be a substantial danger" to M.J.'s physical health in father's custody (§ 361, subd. (d)), because father's conduct proved he was unable to take meaningful steps to curb his marijuana use, notwithstanding the harm it posed to his infant son. (*Christopher R., supra,* 225 Cal.App.4th at p. 1220 [father's persistent marijuana use and failure to comply with terms of his parole sufficient to support removal of infant daughter].)

Father's pending criminal charges, his lack of stable housing and family support, and his inconsistent commitment to satisfying the relatively minor burdens of his son's dependency case were also sufficient to find father was not prepared to safely meet the significant and consequential demands of raising a baby alone.  Father argues housing assistance and unannounced home visits would have been enough to ensure M.J.'s safety.  His argument ignores the tender years presumption, which rests on the reasonable proposition that children young enough to need constant supervision face an " 'inherent' " and substantial risk of serious physical harm if their caregiving parent is engaged in activity that renders him less capable of providing the requisite supervision.  (*Christopher R., supra,* 225 Cal.App.4th at p. 1216.) The evidence showed father had missed visits due to his arrest for making criminal threats against a transit officer.  It showed he cancelled subsequent visits because he could not deal with the " 'stress' " of the dependency case.  And it showed he had no family support in the community to help him with the constant demands of caring for an infant with ongoing medical conditions.

The evidence supports the court's disposition order. (See *id.* at p. 1220 [tender years presumption, coupled with evidence that infant had never lived with father, that there had been inconsistent cooperation with the Department, and that paternal grandfather, with whom father lived, had not agreed to have child placed in his home, supported removal order].)

## 2. *The Juvenile Court Reasonably Exercised Its Discretion to Impose a Monitored Visitation Restriction*

Father contends there was insufficient evidence to support the monitored visitation restriction. We review a juvenile court's visitation order for abuse of discretion. (*In re Tanis H.* (1997) 59 Cal.App.4th 1218, 1227–1228.) In making visitation orders, the court is guided by the principle that "[v]isitation shall be as frequent as possible, consistent with the well-being of the child." (§ 362.1, subd. (a)(1)(A); *In re Nicholas B.* (2001) 88 Cal.App.4th 1126, 1138.) Of equal importance, however, is the statutory directive that "[n]o visitation order shall jeopardize the safety of the child." (§ 362.1, subd. (a)(1)(B).) The juvenile court must balance the "interests of the parent in visitation with the best interests of the child" and "impose any other conditions or requirements to further define the right to visitation in light of the particular circumstances of the case before it." (*In re Jennifer G.* (1990) 221 Cal.App.3d 752, 757.)

Father has not shown the monitored visitation restriction was an abuse of discretion. He argues "no evidence showed unmonitored visits would jeopardize [M.J.]'s safety," citing some positive visits with the baby, while asserting "it was unlikely father would continue to sell methamphetamine if he was granted unmonitored visits." But the evidence showed father

12

continued to engage in criminal conduct while pursuing custody of his son, and his arrest forced him to miss numerous visits without notifying the Department. During visits, father sometimes smelled of marijuana, he failed to change M.J.'s wet diaper, he declined to feed the baby, and he suggested M.J. would be okay if he missed some meals. This conduct demonstrated a risk of potential harm if visits were not monitored. On the other hand, because M.J. was a baby, it was reasonable to infer that a monitor's presence would not prevent father from engaging in age-appropriate activities with the child. Indeed, the positive visits that father cites support that inference. Having balanced father's interest in bonding with his son against the imperative of protecting an infant who could not alert anyone if problems arose during a visit, the juvenile court reasonably imposed a monitored visitation restriction. The court did not abuse its discretion.

## DISPOSITION

The disposition order is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EGERTON, J.

We concur:

LAVIN, Acting P. J.                    DHANIDINA, J.

13